# Richmond

## GEORGE P. WILSON AND LOUISE S. WILSON v. SCHMIDT & WILSON, INCORPORATED.

November 19, 1945.

Record No. 2961.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*H. M. Ratcliffe* and *George E. Haw*, for the appellants.

*George B. White*, for the appellee.

Eggleston, J., delivered the opinion of the court.

On May 2, 1944, the Savings Bank & Trust Company qualified under Code, section 1080a, as guardian of Mrs. Louise R. Westerhold, an incompetent person. On May 25 the bank listed the incompetent's dwelling house on Seminary avenue, in the city of Richmond, with several real estate firms, including Schmidt & Wilson, Incorporated.

These listings were at $16,000, with the understanding that any offer made was to be subject to the approval of the proper court.

On June 7 the bank, as guardian of the incompetent person, instituted a suit under chapter 217 of the Code, for the sale of this real estate. The suit was docketed by consent and a decree was entered referring the cause to a commissioner in chancery with directions to execute the usual inquiries. The commissioner reported, among other things, that the fee-simple value of the property was from $13,000 to $14,000. By decree entered on July 5, this report was confirmed and a special commissioner was named to sell the property, after proper advertisement, at public·auction. The special commissioner was further authorized to seek a private sale of the property, but no offer therefor was to be accepted by him until it had been submitted to and approved by the court.

On July 10 the special commissioner reported to the court that he had· received a written offer from George P. Wilson and Louise S. Wilson to purchase the property at $13,500 cash, that this offer had been made direct to the bank without the intervention of any real-estate broker, and that hence no real-estate commissions were involved. The report recommended that this offer be accepted. On the same day a decree was entered confirming the report and directing the special commissioner to accept the offer and convey the property to the Wilsons upon the receipt of the stated purchase price.

Before any action had been taken under this decree, Schmidt & Wilson, Incorporated, hereinafter called · the broker, filed its petition in the cause, alleging that the property had been listed with it for sale on May 25, 1944, subject to the usual real-estate commissions, that it had been the procuring cause of the offer which had been recommended to and accepted by the court, and that, therefore, it was entitled to a commission of five percent of the purchase price, or $675, for having effected the sale. It prayed that

an allowance of that amount be decreed to it out of the purchase price.

The court, being convinced that the claim for commissions had been presented in good faith, put the purchasers upon terms either to accept the responsibility for and pay any commissions to which the broker might legally be entitled, or else submit to a vacation of the decree confirming the sale. After the Wilsons had filed an answer .to the broker's petition, denying the latter's right to the commissions claimed, by consent of all parties a decree was entered under the provisions of which the matter was submitted to the lower court for its determination, with the reservation of the right of appeal.

It was conceded by all parties, both in the court below and before us, that the Wilsons, as the purchasers of the property, in order to make good their offer made direct to the bank, must pay any commissions to which the broker may be entitled.

The trial court after having heard the evidence *ore tenus* entered a decree holding that the broker was entitled to recover the amount of the commissions claimed, and from that decree the present appeal has been taken.

The first contention of the appellants is that the evidence fails to show that the broker was the procuring cause of the sale, and hence is not entitled to the commissions claimed.

Whether a broker is the procuring cause of a sale of property listed with him is usually a question of fact. *Shea Realty Corp.* v. *Page,* 111 Va. 490, 493, 69 S. E. 327. Since under well-settled principles the finding of the trial court on an *ore tenus* hearing has the force and effect of the verdict of a jury, and has settled all conflicts in the evidence in favor of the broker (*Lowdon* v. *Lowdon,* 183 Va. 78, 79, 31 S. E. (2d) 271), the relevant facts may be thus stated:

Between May 25 and July 1, representatives of the broker showed the property to a number of prospects. Since the dwelling was furnished and the bank retained the keys, one

of its officers accompanied the broker and its prospective customer on each of these trips.

On Thursday, June 29, Mrs. Wallace Blanks, acting for the Wilsons, who lived at South Boston, telephoned the broker's office and asked to speak to Mrs. Pleasants, one of its representatives or saleswomen, in whose name a certain house on Wilmington avenue had been advertised. Mrs. Pleasants was out of the office and Mrs. Blanks talked to Mr. Tyson. In addition to the Wilmington avenue house, which had prompted the telephone call, Mr. Tyson mentioned a number of other residences which the broker had listed for sale. Among them was the Westerhold property on Seminary avenue. Although Mrs. Blanks was acquainted with Mrs. Westerhold, and had been in the house on a social visit, her conversation with Mr. Tyson was the first information that she or the Wilsons had that this property was for sale.

On Saturday, July 1, Mrs. Wilson arrived in Richmond and through Mrs. Blanks made an engagement with Mrs. Pleasants to look at a number of properties that afternoon.

As soon as she had made this engagement, Mrs. Pleasants telephoned the bank and talked with Mr. Godsey, one of its officers, who on previous occasions had been with the broker's salesmen when the property was being shown to prospective customers. She told Mr. Godsey that she wanted to show the Westerhold property to a prospect that afternoon and requested that an officer of the bank meet her there with the keys. She was told that Mr. Word, the president of the bank, would be out of town until after July 4, the following Tuesday, and that no other officer of the bank was available to meet with her and show the property that (Saturday) afternoon.

On the same afternoon Mrs. Pleasants, pursuant to her appointment with Mrs. Wilson, took the latter, Mrs. Blanks, and their mother to see a number of properties in the Ginter Park area in which the Westerhold residence is located. As they passed the Westerhold residence, Mrs. Pleasants remarked that her firm had this property listed for sale at

$16,000, that it was controlled by a bank which insisted upon having one of its officers present when it was being shown, and that while she had not been able to arrange with the bank's officers for an inspection of the property that afternoon, she would make an engagement for that purpose the following week. They then drove into the grounds, looked over the property in some detail, and went up on the porches and looked through the windows. While Mrs. Wilson seemed considerably interested in the property, she stated to Mrs. Pleasants that the price of $16,000 was prohibitive. Before they separated that afternon it was understood that Mrs. Pleasants would arrange with the officers of the bank to show Mrs. Wilson the interior of the house during the following week, and after July 4.

That night Mrs. Blanks and Mrs. Wilson discussed the various properties which they had viewed during the day, and Mrs. Blanks was warm in her praise of the Westerhold property. Naturally, they wondered whether it might not be bought at a smaller price direct from the bank. Mrs. Pleasants testified that she had given Mrs. Blanks and Mrs. Wilson the name of the bank which had the property in charge, and even the name of its president, Mr. Word. This both Mrs. Wilson and Mrs. Blanks denied. At any rate, Mrs. Blanks found out from a friend (Dr. Curry) that Mr. Word was the president of the bank which had control of the property and that it probably could be acquired at a less price than that at which it had been quoted to her. She immediately telephoned Mr. Word and made an engagement with him to show her and Mrs. Wilson the property the next afternoon (Sunday, July 2).

After Mrs. Wilson had inspected the property with Mr. Word, she showed considerable interest in buying it. She asked Mr. Word whether it could be purchased at $13,000. He inquired whether any real-estate commissions were involved and she said "no," although she did say that she had viewed the property with a "real-estate agent" the previous afternoon. However, Mr. Word pursued this inquiry no further.

On the next day (Monday, July 3) Mrs. Wilson made an offer, direct to the bank, to purchase the property at $13,000 cash. This offer was laid before the committee of the bank on Thursday, July 6, and was rejected. But, in rejecting the offer, Mrs. Wilson was led to believe that the bank would accept $13,500 net cash for the property. She immediately telephoned this information to her husband, at South Boston, who on the same day submitted a written offer at this latter figure, which was accepted by the bank and confirmed by the court under the circumstances heretofore related.

In the meantime, on Wednesday, July 5, Mrs. Pleasants telephoned Mrs. Wilson to complete the arrangements for showing her the house in company with one of the bank's officers and was surprised to find out that Mrs. Wilson had already been shown the property by Mr. Word on the previous Sunday. But Mrs. Wilson said nothing about the fact that the bank then had under consideration her offer to buy the property at $13,000.

Mrs. Pleasants immediately telephoned Mr. Word, told him of her connection with the transaction, insisted that she had interested Mrs. Wilson in the property, and asked him "to protect her interests." Mr. Word replied, to use his own language, that "I would do all I could to protect her interests." Despite this conversation, which according to Mrs. Pleasants took place on July 5, Mr. Word continued with the Wilsons his negotiations which thereafter resulted in the sale to them of the property at $13,500.

We agree with the trial court that these facts and circumstances justified a finding that the efforts of the broker were the procuring cause of the sale.

As is said in *Averill* v. *Hart*, 101 W. Va. 411, 132 S. E. 870, 875, the expression "procuring cause" refers to the cause originating a series of events, which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which is the procurement of a purchaser ready, willing and able to buy the real estate on the owner's terms.

In the case at bar the purchasers, through Mrs. Blanks as their agent, first learned that the property in question was for sale through the broker. While Mrs. Blanks knew of the property, the fact that the broker informed her that it was for sale was the cause of Mrs. Wilson's first visit to and inspection of it. According to the testimony of Mrs. Pleasants, which the trial court has accepted, she (Mrs. Pleasants) called the attention of Mrs. Wilson to the property on Saturday afternoon and induced her to make such inspection of it as was then practicable. She pointed out to Mrs. Wilson the attractiveness of the shrubbery and planting around the property and its other pleasing features. Together they inspected the house from the porches. It was only because the bank had not furnished the broker with keys that Mrs. Pleasants was unable to show the prospective customer the interior.

This interest which the broker had awakened in the mind of Mrs. Wilson increased, resulted in the customer's inspection of the property with the representative of the owner on the next day, and culminated in her offer made direct to the bank. When Mrs. Pleasants picked up the thread of her negotiations with her customer on July 5, she found that Mrs. Wilson had already seen the property. It turned out that by that time the Wilsons had made up their minds to make a serious offer for it.

Moreover, as has been said, before the bank received the Wilsons' final offer and caused it to be transmitted to the court, it knew that it was dealing with a customer of the broker and that a claim for commissions might develop.

It is true that Mrs. Wilson testified that the efforts of her sister, Mrs. Blanks, and not those of Mrs. Pleasants, the broker's representative, "interested" her in and induced her to buy the property. No doubt Mrs. Wilson is sincere in this belief, but, in our opinion, the facts and circumstances which we have related were sufficient to justify the trial court in deciding this issue in favor of the broker.

The circumstances in the present case are somewhat similar to those in *Realty Co.* v. *Burcum*, 129 Va. 466, 106 S. E.

375, in which it was held that the broker was not the procuring cause of the sale. In that case the broker pointed out the property to the purchasers while driving past it to view another place, described the house, the boundaries of the property, stated the price, and offered to drive in if the purchasers desired. The purchasers stated that they were not interested in the property and the broker followed the matter no further. Later the purchasers' interest in the property was aroused by other means. But in the case at bar, when the purchaser's attention was first directed to the property by the broker, the purchaser was immediately interested, looked at the property, and shortly thereafter acquired it.

In *Realty Co.* v. *Burcum, supra* (129 Va., at page 473), it was held that the fact that the purchasers had told the owner that they were under no obligation to the broker did not relieve the owner from liability for commissions, if in fact the broker was the procuring cause of the sale.

The next contention of the appellants is, that granting that the broker was the procuring cause of the sale, yet it is not entitled to the commissions claimed, because, they say, by the terms of the contract of employment the broker's right to commissions was predicated upon its procuring a purchaser at the stipulated price of $16,000, and that since the broker was unable to do this the bank, representing the owner, had the right to sell the property at a less price to the broker's customer.

In 8 Am. Jur., Brokers, section 190, pp. 1101-1102, it is said: "The rule is well established that if property is placed in the hands of a real-estate broker for sale at a certain price or upon certain terms, and a sale is brought about through the broker as a procuring cause, he is entitled to commissions on the sale even though the final negotiations are conducted through the owner, who in order to make a sale accepts a price less than that stipulated to the broker or terms more liberal than those the latter was authorized to accept." A great number of cases supporting

the text are collected in the annotations found in 43 A. L. R., p. 1104 *ff.*, and 128 A. L. R., p. 430 *ff.*

This rule is supported in Virginia by *Paschall* v. *Gilliss,* 113 Va. 643, 651-4, 75 S. E. 220, Ann. Cas. 1913E, 778; *Cannon* v. *Bates,* 115 Va. 711, 717, 80 S. E. 581; *Arwood* v. *Hill's Adm'r,* 135 Va. 235, 244, 117 S. E. 603; *Mitchell* v. *Hughes,* 143 Va. 393, 399, 400, 130 S. E. 225; *Patton* v. *Garnett,* 147 Va. 1009, 1015, 1016, 133 S. E. 495; *Blankenship* v. *Childress,* 183 Va. 13, 21, 31 S. E. (2d) 302, 305.

In *Paschall* v. *Gilliss, supra,* certain timber was listed for sale by the owner with the broker at $200,000, subject to a five percent real estate commission. The broker called the property to the attention of a customer who was interested therein but was unwilling to pay the list price. Without the knowledge of the broker, the owner continued the negotiations with the customer and effected a sale of the property at $180,000. This court affirmed a judgment for the broker's commission. In doing so, it pointed out (113 Va., at page 655) that if the commission be not allowed in such a case, then the brokerage business "would not be worth pursuing; gross injustice would be done; every unfair and illiberal vendor would limit his property at a price slightly above the market, and make use of the broker to bring it into notice, and then make his own terms with the buyers, who were in reality procured by the efforts of the agent."

But there is an exception to the general rule above stated. As is said in 8 Am. Jur., Brokers, section 190, p. 1102, "if the broker's contract of employment expressly makes the payment of commissions dependent on the obtaining of a certain price for the property, he cannot recover, even though the owner sells at a less price to a person to whom the broker first shows the property, unless the broker is prevented from making the sale by the fault, fraud, or bad faith of the principal."

Cases supporting this exception to the general rule are collected in annotations found in 43 A. L. R., p. 1111 *ff.*, and 128 A. L. R., p. 432 *ff.*

Among the Virginia cases supporting the exception to the general rule are *Long* v. *Flory*, 112 Va. 721, 72 S. E. 723; *Leicht-Benson Realty, etc., Corp.* v. *Stone & Co.*, 138 Va. 511, 121 S. E. 883, 43 A. L. R. 1100.

In *Long* v. *Flory*, *supra*, the owner listed his property with the brokers at $16,000, or $15,500 net to the owner and $500 to the brokers by way of commissions. The brokers interested a customer (Cline) in the property but were unable to effect a sale to him at the stipulated price. About six months later the owner sold the property to one Rodeffer for $15,500, who in turn conveyed it to Cline, the brokers' customer, at the same figure. The right to commissions was denied on the ground that the owner and the brokers had entered into "a special contract," "predicated upon the consummation" by the brokers "of a sale at the price named."

In *Leicht-Benson Realty, etc., Corp.* v. *Stone & Co.*, *supra*, the owner and the broker entered into a contract predicated upon the sale of property at a stipulated price. The broker interested two sisters in the property who were then unwilling to consummate a purchase of the property unless certain of their property was taken in exchange. The owner declined this offer, and the broker did nothing more. Subsequently the owner consummated a sale of its property to the broker's customers by effecting the exchange originally suggested to the owner by the broker. It was held that the commissions had not been earned, because the broker had been employed to consummate a sale and not an exchange of the owner's property, and that hence, as to the exchange, the broker was a mere volunteer.

In our opinion, the present case comes within the general rule exemplified in *Paschall* v. *Gilliss*, *supra*, and not within the exception exemplified in *Long* v. *Flory*, *supra*.

In the case at bar the bank, representing the owner, and the broker entered into no special contract whereby the broker's right to commissions was predicated upon the sale of the property at a stipulated price. There was a general

listing of the property for sale at $16,000 with several real-estate brokers, including the appellee. It is manifest that this figure was merely intended as an "asking price," or a guide to the broker in starting negotiations. It was not intended as a fixed minimum price, and the broker was to be paid a commission upon procuring a customer who submitted an offer which was satisfactory to the bank and was approved by the court. That this is so is demonstrated by these circumstances: The property was worth only from $13,000 to $14,000; under the terms of the listing, any offer was subject to the approval of the court; and according to the report of the special commissioner, prior to the final offer of the Wilsons the bank had received and considered several other offers for the property, the highest of which was $13,500 subject to a real-estate commission.

In Mechem on Agency, 2d Ed., Vol. 2, section 2437, p. 2025, we find this language which is peculiarly appropriate to the situation before us: "Moreover, it must constantly be borne in mind that not every price named is necessarily a minimum price. Owners of property not infrequently at the outset name an asking price which they have no serious expectation of being able to realize; and while, if no sale takes place, it may not be easy to decide what price would have been accepted, yet, on the other hand, if a sale does take place, without terminating the broker's employment and without any new arrangement with him but as a direct result of his efforts, it is not difficult to determine that realizing the original price was never really regarded as a condition precedent to the broker's right to his commissions."

The same thought is thus expressed in Restatement of the Law of Agency, section 447, pp. 1048, 1049: "*b. Common agreements with brokers.* In the ordinary case where the principal promises a broker a commission for finding a purchaser and the asking terms are stated to the broker, the usual interpretation is that the asking terms are intended merely to guide the broker in starting negotiations, and the broker is to have his commission if he produces a customer

ready and willing to purchase on the asking° terms or on such modified terms as the principal may subsequently accept before the agency is revoked."

In our opinion, there is no basis for the contention that under the terms of the broker's employment its right to commissions was predicated upon its procuring a customer ready, willing and able to purchase the property at the price of $16,000.

The final contention is made that the bank, as guardian of the incompetent person, had no authority to list the property for sale with the broker, and that the latter, in acting under such listing, was a mere volunteer and is not entitled to commissions for having effected this sale. Aside from the fact that no such contention seems to have been made in the court below, it is without merit.

Of course, the broker's right to commissions must be based on a valid contract, express or implied. Since the owner of this property was *non compos mentis* and unable to enter into a contract of employment with a broker, technically the property should not have been listed for sale until such action had been authorized by the proper court in an appropriate proceeding. But here the listing by the bank was made upon the express understanding that the sale of the property and all matters pertaining thereto were subject to the approval of the court, that is, that whatever was done had to be ratified by the court. Subsequently the court accepted the services of the broker and decreed that it was entitled to the commissions claimed. Clearly, this was a ratification of the bank's employment of the broker. See Mechem on Agency, 2d Ed., Vol. 2, section 2426, p. 1994.

On the whole we find no error in the decree appealed from and it is

*Affirmed.*