## Richmond

### Frank V. Atkinson v. S. L. Nusbaum & Company, Inc., V. H. Nusbaum and Justine L. Nusbaum.

June 19, 1950.

Record No. 3667.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Robert Lee Simpson* and *W. R. Ashburn*, for the plaintiff in error.

*Alan J. Hofheimer* and *Robert C. Nusbaum*, for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

This is an action at law to recover brokerage commissions which Frank V. Atkinson, the plaintiff below, claimed he had earned in effecting a sale of certain real property owned by Mrs. Justine L. Nusbaum, one of the defendants. The plaintiff alleged that he had been employed to make the sale by V. H. Nusbaum, the husband of the owner of the property, and by S. L. Nusbaum & Company, Inc., a corporation, of which V. H. Nusbaum is the president. The case was submitted to the trial court without a jury upon

a written stipulation of facts and resulted in a finding and judgment for the defendants which are before us on a writ of error awarded the plaintiff below.

The plaintiff conceded in the oral argument before us that he has no case in the present suit against the defendant, S. L. Nusbaum & Company, Inc., and our sole inquiry is whether the evidence submitted requires a finding in his favor against the other defendants.

These pertinent facts appear in the stipulation:

On or about September 15, 1946, Nusbaum, acting as his wife's "co-owner or co-principal," employed Atkinson, a licensed real estate broker with offices in the city of Norfolk and Virginia Beach, to procure a purchaser ready, willing and able to buy certain improved real estate owned by Mrs. Nusbaum at Virginia Beach. While no specific price was named, it was understood that the property must bring in excess of $30,000. It was further understood that the listing was not exclusive and that the owner might accept a satisfactory offer produced by another broker. Atkinson undertook the employment upon these terms.

During the fall of 1946 Atkinson personally showed the property to several prospects, but was unable to produce an offer from any of them which was acceptable to Mrs. Nusbaum and her husband.

On or about May 15, 1947, Edward M. Davis, III, and his wife called at Atkinson's Virginia Beach office and requested that they be shown some homes at Virginia Beach. The Davises had been living in Richmond, but shortly prior to this interview Davis had obtained employment in Norfolk and was desirous of finding a home in the latter vicinity.

On this occasion Atkinson showed the Davises several pieces of property, including that owned by Mrs. Nusbaum. The Davises made a "thorough inspection" of the Nusbaum property, and Mrs. Davis evinced some interest therein, especially because of the fact that it would afford suitable living accommodations for her white servant. The matter

of the price was discussed and Atkinson informed the Davises that the Nusbaums had recently refused an offer of $30,000, that the property might possibly be bought for $32,500, and that "if they were interested he would be glad to take up the matter of the price with the owner." The parties separated without the Davises making any offer to buy the property.

On or about June 1, and again on or about June 5, Vail, a salesman employed by Atkinson, showed the property to Davis. On neither of these latter occasions did Davis make any offer to buy the property.

Davis said that after these showings of the property to him by Atkinson and Vail, he told Atkinson "that the house was too large for his purposes" and that "he was not further interested" in purchasing it, yet he had not, in fact, "reached any decision either for or against (buying it) and was still interested."

In the meantime J. C. Hutcheson, a salesman employed by S. L. Nusbaum & Company, Inc., which is likewise engaged in the real estate brokerage business, with offices at Norfolk, was advertising certain properties for sale in a local newspaper. Whether this advertisement included the Nusbaum property is not disclosed in the record, but as a result of it Davis contacted Hutcheson sometime between June 5 and 18, and was shown by him several residences, including that of Mrs. Nusbaum. Immediately upon reaching the Nusbaum property Davis informed Hutcheson that this identical property had been previously shown him by Atkinson and that he was familiar with it. Hutcheson replied that Atkinson had no right "to show the property," that it was owned by his "boss" (Nusbaum), and that he (Hutcheson) was in a position to "know whether the property was on the market."

As the result of this conversation Davis was convinced that "Hutcheson was the man to handle the property" and consented to deal through him and did so.

It is agreed that this statement by Hutcheson, that Atkin-

son had no right to sell the property, was not true and was "not authorized" by Mrs. Nusbaum or her husband.

On the morning of June 18, Davis, through Hutcheson, submitted to Nusbaum a written offer to purchase the property at $33,500.

On the afternoon of the same day Atkinson called at Davis's office in Norfolk for the purpose of further discussing with him the purchase of the property, and was informed that he (Davis) had just signed a contract to purchase it through Hutcheson.

On June 19, Atkinson addressed a letter to Nusbaum informing him of the fact that he (Atkinson) and Vail had showed the property to the Davises on several occasions; that he had learned on the previous day, through Davis, that Davis had submitted an offer for the property, and that this had been induced by Hutcheson's representation to Davis that he (Atkinson) was not authorized to sell the property. Consequently, Atkinson said, he had "done all that is necessary to earn a commission upon the sale of the property."

To this letter Nusbaum promptly replied denying that Atkinson had earned a commission for the sale of the property. Nusbaum said that he knew nothing of the negotiations which had taken place between Atkinson and Davis; that Atkinson did not have an exclusive listing of the property, and did not secure or submit any offer from Davis to buy it. Moreover, Nusbaum wrote, his wife was the owner of the property and had not "decided as yet whether she wishes to dispose of" it.

When this letter was written Davis's offer for the property had not been accepted by Mrs. Nusbaum. However, on June 24, it was accepted and the sale was consummated by deed dated September 9.

At the time the transaction was closed Davis signed a letter addressed to Hutcheson, stating that "the said sale was made solely and exclusively through your efforts, and, in my opinion, any and all salesman's commissions on the

transaction have been earned by you alone." Later Davis explained that he had been prompted to write this letter because of Hutcheson's statement to him that Atkinson had no authority to make the sale.

Hutcheson received a commission of $837.50, being 2½% of the selling price of the property.

Atkinson claimed that he was entitled to a commission of 5% of the selling price, or $1,675.

While the stipulation of facts does not expressly so state, it is a reasonable inference from the circumstances that Atkinson knew that he might expect competition from S. L. Nusbaum & Company, Inc., Hutcheson's employer. Atkinson did not have an exclusive listing of the property. The correspondence between him and Nusbaum shows that they were on intimate terms and Atkinson is bound to have known that the firm of which Nusbaum was the head was engaged in the real estate brokerage business and would be interested in selling this property which was on the market.

This, then, is a case of two rival brokers, each aware of the competition of the other, each endeavoring to sell the same property, and each soliciting the same prospective customer who ultimately became the purchaser.

The principles which govern the liability of an owner of property for the payment of commissions to rival brokers, neither of whom is given an exclusive listing, are thus stated in Restatement of the Law of Agency, Vol. II, sec. 448, pp. 1053, 1054: "* * * the broker who first secures the serious attention of the customer ordinarily is entitled to the commission. If, however, the first broker does not continue active negotiations, or if it appears that his negotiations are likely to prove fruitless, the principal is privileged to utilize the services of another broker for the purpose of accomplishing the transaction; if it is found that the services of such other broker predominate in producing the purchase, the principal has no duty to pay com-

mission to the first broker, and the second broker is entitled to the commission for his services."

In 12 C. J. S., Brokers, sec. 92, p. 213, it is said: "Where several independent and rival brokers are employed to effect the same transaction, only one commission is to be paid and that is to be paid in full to the broker who first succeeds and is the procuring cause of the transaction."

"* * * In such case it is the duty of the principal to remain neutral and act in good faith with all the brokers and not interfere in favor of or against any one broker; but where he performs this duty he may close the transaction with a customer produced by any one of the brokers without becoming liable to another one and without being called on to arbitrate the conflicting claims of brokers or to decide which one was the primary and moving cause of the transaction." *Idem.* sec. 92, p. 213.

In *Cannon* v. *Bates*, 115 Va. 711, 718, 80 S. E. 581, we said: "Where two or more of such brokers have been endeavoring to bring about a sale which is formally consummated and each may have rendered meritorious services without which that result would not have been reached, a discrimination must be made between them to ascertain whose services must be deemed to be the efficient and effective cause of the sale." See also, *Smith-Gordon Co.* v. *Snellings*, 130 Va. 528, 531, 107 S. E. 651.

In *Wilson* v. *Schmidt & Wilson, Inc.*, 184 Va. 642, 649, 35 S. E. (2d) 737, 740, we said. "* * * the expression 'procuring cause' refers to the cause originating a series of events, which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which is the procurement of a purchaser ready, willing and able to buy the real estate on the owner's terms."

Whether a broker's services are the procuring cause of a sale is usually a question of fact depending upon the circumstances of the particular case. *Wilson* v. *Schmidt & Wilson, Inc., supra* (184 Va., at page 646, 35 S. E. (2d) at page 739).

■ In an action by a broker to recover commissions, the burden is on him to prove by a preponderance of the evidence that his services were the procuring or efficient cause of the sale. *Smyth Bros.-McCleary-McClellan Co.* v. *Beresford,* 128 Va. 137, 156, 157, 104 S. E. 371; *Gordan* v. *Tazewell,* 184 Va. 536, 541, 35 S. E. (2d) 816, 818.

■ The services of a broker may be the procuring cause even though the transaction is closed or consummated by the principal through the medium or with the assistance of another broker. *Washington* v. *Garrett,* 189 Va. 57, 52 S. E. (2d) 83. And, conversely, unless the principal gives the broker an exclusive agency, or unless the principal promises to pay him a commission on a transaction regardless of who effects it, a broker who is unsuccessful in effecting a transaction in behalf of the principal and is not the procuring or efficient cause of such transaction is not entitled to a commission on the success of another broker, even though he (the first broker) finds or first contacts the ultimate contracting party, shows him the property involved, and interests him in it. 12 C. J. S., Brokers, sec. 92, p. 214.

These well-settled principles were recognized and applied in *Cannon* v. *Bates, supra.* In that case Bates, a real estate broker, solicited Dr. James Cannon for the right to sell a lot which the latter owned in Richmond. Cannon fixed the price of the property at $160 per front foot, but declined to give Bates an exclusive listing, telling him that it was also listed with another broker, Elam. Bates offered the lot at $160 per front foot to Wood, who declined to buy at this figure and countered with an offer of $150. Bates reported this offer to Cannon who refused it.

Cannon conferred with Elam, through whom he had purchased the property, and decided to increase the price to $175 per front foot for the corner, or $170 for the whole, and so notified Bates. Bates again endeavored to sell the property to Wood, his prospect, at the increased price, but was unsuccessful. Wood, without Bates' knowledge,

went to Elam and through him made an offer of $167.50 per front foot, which was accepted by Cannon who paid the usual commission to Elam. These entire negotiations between Cannon, the two brokers and the purchaser covered a period of only nine days.

In that case Bates was the broker who first showed the property to Wood, the ultimate purchaser, and Cannon had actual knowledge of this.

In an action against Cannon for broker's commissions Bates recovered a verdict and judgment which this court reversed on the ground that the jury had been improperly instructed.

At the instance of the plaintiff, Bates, the court instructed the jury, in substance, that if they believed from the evidence that the plaintiff had "interested" Wood in the property "as a prospective purchaser" and had given his name as such to the defendant, Cannon, and that thereafter, while the authority of the plaintiff, Bates, was "unrevoked," the defendant, Cannon, through another broker, negotiated a sale of the property to Wood, then the plaintiff was the procuring cause of the sale and was entitled to a verdict. This instruction, we held, was erroneous.

We further held that the court erred in rejecting an instruction asked for by the defendant which, in substance, told the jury that if they believed from the evidence that the defendant "had placed his property in the hands of several real estate agents to sell," and that the plaintiff and Elam "were among that number, then the agent who procured a purchaser ready and willing to complete the purchase upon terms satisfactory and agreed to by the defendant is entitled to commissions on the sale, to the exclusion of all other agents;" and that if they further believed from the evidence that Elam "first secured" from Wood "an offer to purchase the lot in question at the price of $167.50 per front foot, which was accepted by defendant and the sale made to Wood at that price," then the plaintiff, Bates, was not entitled to recover.

In the course of the opinion this court reviewed a number of cases from other jurisdictions dealing with the liability of an owner of property for the payment of commissions to rival brokers. The principles there enunciated are supported by a wealth of authority, and are controlling in the case now before us.

■ The fundamental principle is that where rival brokers are involved, each of whose services contribute to the result, the broker seeking to recover a commission must show that his services were the efficient, predominating and procuring cause of the sale. Who may have first called the attention of the purchaser to the property, or who may have finally closed or consummated the contract, are pertinent factors but neither is controlling. The broker who first directed the attention of the customer to the property may relax his efforts, with the result that a second broker may step in and by efficient and persistent work induce the customer to buy. Thus the efforts of the second broker are the procuring cause of the sale. To the first broker this is one of the inevitable risks of the business. Such was the situation in *Cannon* v. *Bates, supra.*

On the other hand, the efforts and inducements of the first broker may be such that the customer may have decided to make an offer for the property, leaving open only the matter of reducing the offer to writing. In this situation a second broker may not reap the rewards of the efforts of the first by merely obtaining and presenting to the owner a written offer to buy the property. Such was the case in *Washington* v. *Garrett, supra,* relied on by the plaintiff in error.

■ When these principles are applied to the case before us we have no difficulty in reaching the conclusion that the trial court correctly held that the plaintiff, Atkinson, had failed to prove that his services were the efficient, predominating and procuring cause of the sale. While Atkinson first showed the property to the Davises and interested them in it, he was unable to procure from them

an offer to purchase. Indeed, the interest of the Davises was so slight that Atkinson did not obtain and submit to them a final price from Nusbaum, or even report to him that he was negotiating with these parties. On the other hand, Hutcheson, acting for S. L. Nusbaum & Company, Inc., persuaded the Davises to make a written offer for the property which was finally accepted by the owner.

It is true that the Davises were influenced, to some extent at least, in consummating the deal through Hutcheson by the latter's false statement that Atkinson, the rival broker, had no authority to sell the property. But however unethical or reprehensible Hutcheson's conduct may have been, it does not operate to convert Atkinson's unsuccessful efforts into the efficient, predominating and procuring cause of the sale. Atkinson's case must rest on his own efforts and not on the misconduct of his rival.

Again, Hutcheson's misconduct is not chargeable to the Nusbaums, for it is expressly stipulated that his false statement was "not authorized" by them. Indeed, so far as the record shows, the Nusbaums acted in entire good faith and with strict neutrality between the rival brokers.

It is argued with much earnestness that Nusbaum, as his wife's co-owner or co-principal, and as president of S. L. Nusbaum & Company, Inc., Hutcheson's employer, had imputed or constructive notice, through the information which Davis imparted to Hutcheson, that Atkinson had already showed him (Davis) the property. Assuming, but not deciding, that such notice resulted from the relationship of the parties, Atkinson's claim is not improved thereby.

Where property is listed with two or more brokers, the broker who first shows it to the customer and notifies the owner that he has done so is not entitled to a commission where the same customer ultimately buys the property through the effective efforts of a rival broker. Manifestly, the first broker cannot thus earmark for his exclusive benefit every customer to whom he shows the property, or acquire the right to a commission by merely notifying the

owner that he has a live prospect. He must still show that his efforts were the procuring cause of the sale.

In *Cannon* v. *Bates, supra,* as has been pointed out, Cannon, the owner, had actual knowledge before closing the deal that Bates had first showed the property to Wood, the ultimate purchaser, and yet we held that Bates could not recover a commission where the efforts of a rival broker were the procuring cause of the sale. See also, *Kacavas* v. *Diamond,* 303 Mass. 88, 20 N. E. (2d) 936; *Hege* v. *Voelker,* 183 Wash. 375, 48 P. (2d) 579.

For these reasons we are of opinion that the judgment should be affirmed, and it is so ordered.

*Affirmed.*