## Richmond

QUALITY HOME BUILDERS OF NORFOLK, INCORPORATED v. HENRY
E. HERRICK, INDIVIDUALLY AND TRADING AS HERRICK REALTY
COMPANY.

April 27, 1970.

Record No. 7124.

Present, All the Justices.

*Israel Steingold* (*Donald C. Grey; Steingold, Steingold & Chovitz;
Murphy & McGeein*, on brief), for plaintiff in error.

*Alan J. Hofheimer; Thomas F. McPhaul* (*Hofheimer, Nusbaum
& McPhaul*, on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

Henry E. Herrick, Individually and Trading as Herrick Realty
Company, a proprietorship, appellee, filed his motion for judgment
in the court below to recover $27,300 from appellant, Quality Home
Builders of Norfolk, Incorporated. Herrick alleged that appellant
engaged him on or about April 10, 1967 to find a buyer ready, will-
ing and able to purchase its real property located in Norfolk, identi-
fied as Bayview Manor Apartments. He further alleged that he
obtained a prospective purchaser (Carva Food Corporation, trading
as Carva Investment Company); that he produced a written offer of

$450,000 for the property, which was rejected; and that thereafter appellant discharged him and sold the said property to Carva for $455,000. The amount claimed represents commissions of 6% of the sales price.

Numerous motions were made and pleadings filed by the respective parties. The issue was submitted to a jury and resulted in a $10,000 verdict for appellee, which was approved by the trial court and final judgment entered. To this action we granted appellant a writ of error.

Several assignments of error are made. In view of our decision, we need only consider the sufficiency of the evidence to sustain the judgment.

There is no substantial controversy over the evidence.

Appellee is properly qualified as a licensed real estate broker under the laws of Virginia, with his principal office in Norfolk. Appellant corporation was the owner of the Bayview Manor Apartments. The officers and stockholders of the corporation are James A. Murphy, Jr. and William C. Bunch. James M. Hill, president of Carva Food Corporation, conducted all negotiations for his company.

In the early part of April, 1967 Carva was interested in purchasing some income-producing property in the Norfolk area, and Hill responded to a newspaper advertisement inserted by appellee. Hill met with Herrick, and they viewed numerous properties which were listed with this broker.

At that time, and while making what the parties called "a windshield inspection" of properties, they drove by the Bayview Manor Apartments. Herrick asked Hill how they would appeal to him, and how he liked the area and the apartments. Hill expressed interest, and Herrick responded that he would see if they could be purchased.

Herrick testified that the apartments were not listed with him and that he did not then have them for sale. Hill testified that Herrick said they were listed with him. This discrepancy in their testimony is not material.

Immediately after returning to his office, Herrick requested an associate, Thomas R. Powell, "to find out if they could be bought, if they were for sale, and, if so, at what price and under what conditions and what were all the statistics pertaining to it". Powell phoned Murphy (2 or 3 times according to Murphy) and was told that the apartments were for sale at "$500,000 *net* to us". Murphy

advised Powell to be discreet, that he did not want any publicity or for the property to be advertised. He also agreed to provide the necessary information about the property, and this was done.

Appellee testified that he showed the apartments to Hill, who expressed interest but felt the sale price was not realistic. While not recalling the exact price he quoted, Herrick admitted using the $500,000 as a basis and adding some commission. Hill stated that he was not given a direct price, but that in response to his question, "What do you think it really will take to buy [the] buildings?", Herrick replied, "I think $420,000 will take them".

Herrick's statement was that Hill eventually called and authorized him to draw up a contract offer of $420,000 which was done.

The contract, designated "official sales contract", is dated April 6, 1967, and represents a formal offer by Carva of $420,000 for the Bayview Manor Apartments. No amount was inserted for commissions to the agent.

This written offer, together with Hill's check for $10,000, was taken to Murphy by Herrick, and was promptly rejected. Murphy took the written contract or offer and wrote "void" on it. He was indignant over the small amount of the offer, and upset that Herrick had disregarded his instructions in showing the property.

At this conference Murphy went into great detail with Herrick as to the amount invested in the property, the amount recently paid to acquire the interest therein of another individual, and the reason for the asking price. During the course of their conversation, Murphy finally reduced the price to $455,000 *net* for the property.

Herrick said the only, discussion of a commission was when Murphy agreed to accept $455,000 *net*, observing: "[If] you want to go out and get $460,000, take $5,000 for yourself, that is okay." Herrick testified that Murphy did not agree to pay him any commission out of the $455,000.

Murphy's version of this conversation is that Herrick indicated he was insulted by the suggestion of a deal that would give him only $5,000. Murphy said that because of this reaction he then told Herrick: "[T]hat was the end of it as far as I was concerned, . . . and that the property was no longer for sale through Herrick Realty at any price." He said that Herrick was discharged as of that time.

Herrick testified that he reported back to Hill the sale offer of $455,000 net, to which Hill responded, "They are not going to sell them right away. Let us think this over".

Thereafter, on or about the 17th of April, 1967, Herrick prepared another written contract that was signed by Hill, on behalf of Carva, wherein it offered and agreed to pay $450,000 for the Bayview Manor Apartments. Again no amount was inserted for commissions to the agent. This contract was submitted to Murphy by Powell. Murphy took it into another room and conferred with his associate, Bunch. He came back after having amended the contract by striking out the words and figures "$450,000" and substituting in lieu thereof "$475,000", and after having amended the commission clause by striking out the word "seller" and inserting in lieu thereof the word "buyer". The effect of this last amendment was to provide that any broker's commission would be paid by the buyer. He gave the contract to Powell, observing, "Well, this is the way we want it, take it or leave it".

Murphy resented the fact that Powell came back with the offer after Herrick had been discharged. He concluded that "the only thing they [referring to Powell and Herrick] were interested in was making a commission". Murphy said that he and Bunch "decided that we would get rid of these people once and for all, both Mr. Herrick and Mr. Powell and the buyers, too, so we gave them this counter offer for . . . $475,000 and indicated that the buyer was to pay any commission, and we figured that way they would leave us alone".

Hill testified that Powell phoned him that his offer of $450,000 had been refused. He learned of the amendments made by Murphy upon picking up the copies of the contract the following day. He regarded the $450,000 offer as a closed issue, it having been made and rejected by Murphy.

Hill then let the matter drop, being "under the assumption that for some reason we did not get together". However, he "never felt right about it" and had the feeling "that something transpired I didn't know about".

The only other connection that Herrick had with the transaction was that sometime after the $450,000 offer was rejected, he saw Murphy and said to him: "Well, Mr. Murphy, we are going up and down like a Yoyo here. Can't we establish something?" He says Murphy responded: "Look, the sale is off, I am finished and they are not for sale, they are off the market, finished." Subsequently he spoke to Murphy again and said that Murphy responded, "The deal is still the same, they are off the market".

About the middle of July, Hill called Murphy and asked permis-

sion to see him. He went to Murphy's office and told him of his feelings and how he "just wanted to clear the air". Murphy told him what had transpired with Herrick and Powell. Hill again expressed interest in the property and made an offer of $450,000. Murphy would not sell for less than $455,000, and Hill concluded to pay that sum. A written contract of purchase and sale between Carva and Quality Home Builders was executed by the parties on July 17, 1967. Carva paid $455,000 for the property.

This court has reviewed numerous cases by brokers to recover their commissions for sale of properties. The general rule, and the exception thereto, are set forth in *Wilson* v. *Schmidt & Wilson*, 184 Va. 642, 651, 652, 653, 35 S. E.2d 737, 741, 742, (1945) as follows:

> "In 8 Am. Jur., Brokers, section 190, pp. 1101-1102, it is said: 'The rule is well established that if property is placed in the hands of a real-estate broker for sale at a certain price or upon certain terms, and a sale is brought about through the broker as a procuring cause, he is entitled to commissions on the sale even though the final negotiations are conducted through the owner, who in order to make a sale accepts a price less than that stipulated to the broker or terms more liberal than those the latter was authorized to accept.' A great number of cases supporting the text are collected in the annotations found in 43 A. L. R., p. 1104 *ff.*, and 128 A. L. R., p. 430 *ff.* [Citing numerous Virginia cases supporting the rule.]

> \* \* \*

> "But there is an exception to the general rule above stated. As is said in 8 Am. Jur., Brokers, section 190, p. 1102, 'if the broker's contract of employment expressly makes the payment of commissions dependent on the obtaining of a certain price for the property, he cannot recover, even though the owner sells at a less price to a person to whom the broker first shows the property, unless the broker is prevented from making the sale by the fault, fraud, or bad faith of the principal.'

> "Cases supporting this exception to the general rule are collected in annotations found in 43 A. L. R., p. 1111 *ff.*, and 128 A. L. R., p. 432 *ff.*

> "Among the Virginia cases supporting the exception to the general rule are *Long* v. *Flory*, 112 Va. 721, 72 S. E. 723; *Leicht-*

*Benson Realty, etc., Corp.* v. *Stone & Co.*, 138 Va. 511, 121 S. E. 883, 43 A. L. R. 1100."

In *Campbell* v. *Sickels*, 197 Va. 298, 303, 89 S. E. 2d 14, 19 (1955), the court, speaking through Mr. Chief Justice Hudgins, said:

"There is a distinction in the duties imposed upon a broker between a mere listing property for sale with him and a special contract of employment. In commenting upon this distinction, Judge Prentis, in *Leicht-Benson Corp.* v. *Stone & Co.*, 138 Va. 511, at 514, 121 S. E. 883, 43 A. L. R. 1100, said: 'One distinction which seems sometimes to be overlooked is as to the specific character of the employment. If the broker is employed generally to find a purchaser and introduce him to the owner and they negotiate the sale, the broker is entitled to his commissions, but a different rule applies, or should apply, where the terms of sale are specifically fixed in advance and the broker's authority is limited to finding a purchaser who will buy the property upon the prescribed terms. In the latter instance in the absence of deceit or fraud on the part of the owner, the broker is entitled to no commission unless he finds such a purchaser. . . . A broker is never entitled to commission for failing to perform his contract. To entitle him to his commissions, he must succeed and he must take the entire risk of failure for his reward comes only as a consequence of his success. He may devote his time and labor and expend his money with ever so much devotion to the interest of the owner and yet if he fails to procure a purchaser' willing, and able to buy upon the terms and conditions fixed by the principal 'he does not earn his commissions.' This case and many others are reviewed in *Edwards* v. *Cragg*, 188 Va. 564, 50 S. E. (2d) 281."

See also *Hensley* v. *Moretz*, 197 Va. 440, 90 S. E. 2d 183 (1955) and 12 Am. Jur. 2d, Brokers, § 225, p. 966.

Herrick alleged in his motion for judgment that he was "engaged" by Quality Home Builders to find a buyer to purchase the property in question. In his bill of particulars he alleges that the agency created was "a special agency" between owner and broker. Evidence of the existence of any contract between the parties is tenuous. However, assuming a contract, it was clearly a special contract predicated upon the consummation by the broker of a sale at the net price named.

Admittedly the property was never listed with Herrick in the normal and customary manner. Appellee concedes that his commission was not the subject of an express agreement. To determine the relationship between broker and owner and their agreement, if any, we must look to their dealings. They consisted of a telephone call by the broker to the owner to determine the price for which the apartments could be purchased and the receipt of an asking price of $500,000 net; a $420,000 offer to purchase by the broker's client, which was rejected; a reduction of the selling price by the owner to $455,000 net; and a second offer to purchase by the broker's client of $450,000, which also was rejected. The written contract embodying the second offer was amended by the owner to increase the selling price to $475,000 net.

The evidence reveals that every offer to sell by the owner was for a net amount, and provided for the payment of no commission by the seller. Every offer to buy by the broker's client, prior to the discharge of the broker, was for an amount less than the net price which the owner would accept.

Herrick argues that he "procured" the ultimate purchaser of the property. The answer to this is that appellee never "procured" a purchaser who was ready, willing and able to meet the terms and conditions prescribed by the owner while he [Herrick] was negotiating for Carva. This further quotation from *Wilson* v. *Schmidt & Wilson, supra,* is pertinent here:

"As is said in *Averill* v. *Hart,* 101 W. Va. 411, 132 S. E. 870, 875, the expression 'procuring cause' refers to the cause originating a series of events, which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which is the procurement of a purchaser ready, willing and able to buy the real estate on the owner's terms." 184 Va. 649, 35 S. E. 2d 740.

In *Rotella* v. *Lange,* 202 Va. 575, 578, 118 S. E. 2d 516, 519 (1961), we said:

"In order to form a contract there must be no variance between the acceptance and the offer. 'A proposal to accept upon terms varying from those offered is a rejection of the offer and puts an end to the negotiations, unless the party who made the original offer renews it or assents to the modification suggested,

Having in effect rejected the offer by his conditional acceptance, the offeree cannot subsequently bind the offeror by an unconditional acceptance.' *Richeson* v. *Wilson*, 187 Va. 536, 546, 47 S. E. 2d 393, 398.

"Here the listing agreement committed the defendant to sell for $9,000 cash. There were no other terms or conditions, and no agreement to pay commission to the plaintiff on any other sort of sale. By the offer of purchase submitted by the plaintiff the purchasers agreed to pay $9,000 cash only if and when they secured an A. B. C. license, a board of health permit and a five-year lease of the building at $150 a month. One of the prospective purchasers, the only one who testified, stated that they would not have bought the defendant's business if they could not obtain those three things. Their offer to purchase was made subject to those conditions. On its face it could not be enforced against them if they failed to obtain those things. It was in effect a counter offer which had the legal effect of rejecting the defendant's offer of sale. *Richeson* v. *Wilson, supra.*

"Clearly the defendant had a right to reject an offer to buy which was not in compliance with his offer to sell. . . .

"The plaintiff having failed to procure a purchaser ready, able and willing to buy according to the terms of the listing agreement, he was therefore not entitled to collect the commission provided for in that agreement."

Herrick complains that the owner's price for the property fluctuated. It is true that the owner did place three prices on the property during the period of negotiations. The question of price and the terms and conditions of sale were matters within the discretion and judgment of the owner.

We do not have a case here where a broker is prevented from making the sale by the fault, fraud or bad faith of his principal. There is neither allegation nor proof that Quality Home Builders did anything to frustrate or sabotage the sale, or that it terminated its relationship with Herrick to avoid payment of commissions. Neither the broker nor his client are in a position to complain. Herrick failed to effect a sale for the reason that Carva was then unwilling to pay the price that would buy the property.

Herrick was discharged from any further dealings with the property some three months before Hill personally contacted Murphy and concluded to purchase the property for the net amount de-

manded by Quality Home Builders. The amount paid by Carva was the least net amount that Murphy ever agreed to accept.

There was no contract, agreement or relationship between the broker and owner which would justify a recovery of a commission on a *quantum meruit* basis. Such contract as existed was a special contract. Appellee is not entitled to recover any commission from appellant since he never procured a purchaser willing to buy the property according to the terms of that special contract.

The judgment appealed from is accordingly reversed, and final judgment for the appellant will be entered here.

*Reversed and final judgment.*