## CIRCUIT COURT OF THE CITY OF RICHMOND

T. W. Throckmorton, Jr.

     v.

Egg Harbor Boat Co., Inc.

December 8, 1975

Case No. 7954

BY JUDGE ALEX H. SANDS, JR.

This is an action in which plaintiff seeks to recover damages alleged to have been sustained as the result of loss of a sales commission due to actions on the part of the defendant company, acting through one of its officers.

The facts as developed by the evidence introduced at trial are, for the most part, not in dispute. Plaintiff had, for some time in the past, been operating a boat sales agency in the Richmond and surrounding areas under a formal dealer franchise agreement with Pacemaker. (Actually, the agreement was not with plaintiff in his individual capacity but with Virginia Yacht Sales, Inc., a company solely owned and operated by plaintiff.) Pacemaker and Egg Harbor later became affiliated (the nature of this affiliation is unimportant insofar as the merits of this litigation are concerned) and both parties concede that, although there was no formal dealership arrangement under which plaintiff (or his corporation) was representing Egg Harbor, such representation was understood to be upon the same basis as that which existed between plaintiff and Pacemaker.

Prior to the facts giving rise to the case at bar, James Fanseen, a friend of both plaintiff and Philip Boyd, vice president of sales for Egg Harbor, had sales dealings with both plaintiff and defendant, and, in fact, had been initially referred to plaintiff by Boyd.

On the occasion in question, May 15, 1974, Fanseen approached plaintiff and expressed interest in the purchase of a used boat. Not having a used boat in stock to meet the specifications and price desired by Fanseen,

the latter, after discussing his desires with plaintiff, finally decided to purchase a thirty-foot Egg Harbor boat of the type manufactured by defendant company. Plaintiff did not have the desired model in stock but stated that he would endeavor to acquire one and would sell it to Fanseen at a price which would net plaintiff a $2,000 commission, this being considerably lower than the customary commission realized upon the sale of this type boat. Plaintiff promptly telephoned Boyd who informed plaintiff that the only two boats of the type in which Fanseen was interested which defendant had in stock had already been sold to other dealers but that he, Boyd, would attempt to locate one and would call plaintiff back as to the results of his search.

At this point, Fanseen departed stating that he was still interested in a thirty-foot Egg Harbor boat if plaintiff could locate one and that he was also still interested in a used craft if plaintiff could find one to fit his price and specifications. Fanseen emphasized the fact that he was particularly anxious to acquire a boat before the end of the month when he was to begin his vacation.

Not having heard from Boyd by four o'clock the following afternoon, plaintiff telephoned him and was informed by Boyd that Fanseen was then in his, Boyd's, office and was asked to hold the phone. After waiting several minutes without response, plaintiff hung up.

The initial conversation between plaintiff and Fanseen was on Wednesday, May 15. On the following Monday, having received no word from either Boyd or Fanseen, plaintiff telephoned the latter and was told that he had purchased a thirty-foot Egg Harbor craft from another dealer.

Boyd's testimony is that after his initial conversation with plaintiff, he contacted both of the dealers to whom he had committed the two thirty-foot Egg Harbor boats in defendant's stock and attempted to get each to release his commitment, without success. He says that when Fanseen visited him, he informed him that the only two craft of the type desired by Fanseen had been committed to two dealers, one of whom was named Nickerson, upon receiving which information, Fanseen promptly contacted Nickerson and bought the boat.

### Respective Contentions of the Parties

Based upon the above facts, plaintiff contends that he had a potential sale of a thirty-foot Egg Harbor craft firmed up with Fanseen conditioned only upon plaintiff's being able to locate and acquire such craft; that he did, in fact, locate one owned by a Florida dealer and would have been in

position to make delivery to Fanseen before the Memorial Day deadline but for Boyd's having put Fanseen in touch with Nickerson. He says that Boyd's action was violative of defendant's duties to plaintiff imposed by the dealership agreement and constituted interference with his sales negotiations with Fanseen, all of which deprived him of the $2,000 commission which he would have earned upon a sale to Fanseen. Specifically, says plaintiff, Boyd's act violated the company-dealer relationship in two particulars; i.e., (1) in having failed to promptly notify plaintiff of his, Boyd's, inability to locate a boat of the desired type, which would have enabled plaintiff to promptly pursue further inquiries on his own; and (2) in having disclosed to Fanseen the name of another dealer known to have a thirty-foot Egg Harbor craft ready for sale and delivery.

Defendant, on the contrary, contends that Boyd's actions were in no way violative of any duty which it owed plaintiff under any company-dealer agreement; that Boyd never recommended Nickerson to Fanseen, nor did he volunteer any information to Fanseen but had merely told him, as the reason why defendant had no thirty-foot Egg Harbor crafts on hand, that the two which had been in defendant's inventory had been committed to two dealers and had given Fanseen the names of both. Boyd stated that he had attempted to telephone plaintiff on one or more occasions between Thursday and the weekend and had been unable to reach him and that he did not attempt to call again because of the press of other matters.

Plaintiff does not contend that Boyd acted with any thought in mind of intentionally interfering with plaintiff's sale negotiations, nor with any intention of cutting plaintiff out of his sales commission but charges Boyd with neglect in the discharge of duties owed plaintiff.

### Merits Considered

Liability of defendant, if any, must be predicated upon some breach of duty owed by defendant to plaintiff. Under the evidence in this case, any duty as to which it is claimed a breach occurred must have been created either (a) by the terms of the company-dealership franchise agreement between the parties, or (b) by a past course of conduct established between the parties. It is, therefore, necessary to consider what rights and responsibilities quoad the parties were established either by the agreement, on the one hand, or an established course of dealings on the other.

While it is admitted that there existed no written agreement defining the terms of any relationships under the dealership arrangement between the parties, it is conceded by both parties that plaintiff and defendant were in

agreement that they were to be governed by the same terms as those embodied in the written agreement previously existing between plaintiff and Pacemaker Corporation (Plaintiff's Exhibit 1).

Having carefully reviewed the written dealership agreement (Plaintiff's Exhibit 1), the Court has been unable to find, nor during trial was it cited to, any provision thereof which has been violated directly or indirectly by the acts of the defendant complained of by plaintiff. We must, therefore, turn to an examination of the established course of conduct existing between plaintiff and defendant.

There is, again, little, if any, conflict in the evidence upon this point. At an annual meeting attended by manufacturers of and dealers in pleasure craft, each dealer will indicate to his manufacturers the number and style of boat he believes his dealership can handle for the following twelve-month period and the approximate date or dates upon which he would desire delivery. He is assigned no specific craft by hull number, but it is contemplated that delivery will be made to the dealer of the number of craft requested on or before a date agreed upon. To this extent it can be said that the number of boats requested are "committed" to the particular dealer. He is, however, not legally obligated to accept all craft so "committed," but if a tender of the craft is made by the manufacturer to the dealer and the dealer refuses to accept the tender, the "commitment" is considered released and the manufacturer may then recommit or sell to any other dealer.

As between manufacturer and dealer, the *modus operandi* appears to be on a strictly cash basis. There are no consignments from manufacturer to dealer, nor is there any type of floor planning operation used. On occasion, depending upon the wishes of the dealer, the dealer will pay for the craft, accept title, and have delivery made to his location. More frequently, however, the dealer prefers to have title pass directly from the manufacturer to the purchaser and pickup by the purchaser takes place at the manufacturer's location. In such instances, the dealer is really acting in the capacity of broker. Defendant manufacturer never pays any commission. His is a direct sale to the dealer, and he only suggests a retail price to the dealer who is not bound by such recommendation and who fixes his own price to include such commission as he sees fit. Such is really more of a retail "markup" than a "commission."

Any "sales leads" emanating from the dealer's area are referred to such dealer, but even this procedure can be varied by the manufacturer who can refer sales leads emanating in a dealer's area to dealers outside of the area

of the dealer having primary responsibility for the area where such other dealer is located within "reasonable" proximity to the prospective purchaser. See Plaintiff's Exhibit 1, page 4.

As can be seen from the above, the duties and responsibilities as between defendant and its dealers are very general and elastic. There was no legal duty upon defendant's part to find a boat for plaintiff so that he could complete a sale. Boyd's offer to attempt to do so was, at most, an act of amenity because of the desire upon defendant's part to render assistance to a dealer.

The difficulty with plaintiff's position throughout is in the fact that it is based upon the premise that defendant, through Boyd, interfered with a sale being negotiated by plaintiff. This premise is false because plaintiff had nothing to sell. While it is true that Fanseen had indicated a willingness to pay plaintiff a fixed price which would include a so-called "commission" of $2,000 if he could produce the type craft desired, yet Fanseen would appear to have remained, at all times, a free operator insofar as plaintiff was concerned. But, whether Fanseen would have been obligated to have bought from plaintiff had plaintiff produced a craft of the type discussed is a question which is not before the Court.

Certainly the fact that Boyd, upon inquiry from Fanseen, informed him of the availability of a craft of the type desired and of the name of the owner, could, in no conceivable way, impose any legal liability upon defendant company.

Plaintiff relies upon *Atkinson v. Nusbaum*, 191 Va. 82 (1950). This case, factually, is not apposite to the case at bar. In *Atkinson*, the situation involved two brokers showing the same piece of real estate, the issue being which of the two brokers was entitled to the commission upon the sale of the property, the outcome depending upon the Court's determination, as between the brokers, as to which one was the procuring or efficient cause of the sale.

It is true, as plaintiff contends, that in the case of the two brokers, employed by the same principal to handle the property, the owner (principal) should remain neutral and not interfere in favor of or against any one broker.

In the present case, however, not only was the defendant not in position of owner, but the evidence also fails to support any claim of interference upon the part of defendant with plaintiff's business transactions.

For the above reasons, judgment will be in favor of the defendant.