## Richmond

K<small>ORZENDORFER</small> R<small>EALTY</small>, I<small>NC</small>. v. R<small>USSELL</small> A. H<small>AWKES</small>, E<small>T</small> A<small>L</small>.

January 18, 1971.

Record No. 7271.

Present, Snead, C.J., I'Anson, Gordon, Harrison, Cochran and Harman, JJ.

*Grayson P. Hanes* (*William B. Hanes; Hazel, Beckhorn and Hanes; Hanes and Hanes*, on brief), for plaintiff in error.

*Lewis Hall Griffith* (*Griffith, Shalloway & Davis*, on brief), for defendants in error.

C<small>OCHRAN</small>, J., delivered the opinion of the court.

This action was instituted by petition for attachment filed by Korzendorfer Realty, Inc., against Russell A. Hawkes, a non-resident of Virginia, Ralph Metts and James Woodmancy, principal defendants, and certain co-defendants.

The petition alleged that a real estate commission of $100,000.00 was payable by the principal defendants to petitioner for services

rendered in procuring the sale of 1650 acres of land in Stafford County to American Realty Service Corporation. Various motions and pleadings were filed and, by agreement, the case was tried by the court without a jury. After hearing the evidence *ore tenus* the court found for the defendants and entered its judgment order thereon on November 25, 1968, from which we granted petitioner a writ of error.

The question presented by the material assignments of error is whether the court erred in holding from the law and the evidence that there was no contract, express or implied, under which Korzendorfer Realty was entitled to a real estate commission.

Under familiar principles the findings of fact of the trial court are to be given the same effect as a jury verdict settling conflicts in the evidence and must be upheld if there was evidence to support them. *Reiber* v. *Duncan*, 206 Va. 657, 660, 145 S. E. 2d 157, 160 (1965). These findings include the following:

"(1) that neither the plaintiff nor any of its agents was employed by the defendants to make sale of the tract of land which is in issue in this case; (2) that the ultimate purchaser, American Realty Service Corporation, was introduced to the defendants by an agent of the plaintiff; (3) that the defendants in their negotiations believed the plaintiff was acting as an agent for the purchaser and never accepted the plaintiff's aid (4) that the acts and conduct of the plaintiff were not such as to give the defendants reason to believe that it expected compensation from the defendants . . . ."

Certain facts are uncontroverted. Hawkes, Metts and Woodmancy had an option to purchase a tract of 1650 acres and had incurred substantial costs in having engineering and feasibility studies and other plans made for development of the property. They thought that they could acquire an adjoining tract of approximately 300 acres (actually 292.8 acres), which was susceptible of development with the 1650 acre tract.

On April 1, 1968, a representative of American Realty Service Corporation was introduced to Metts by an officer of Korzendorfer Realty. In July, 1968, the principal defendants sold the 1650 acre tract for $600.00 an acre, or a total of $990,000.00, to a wholly owned subsidiary of American Realty Service Corporation. At the same time the purchaser acquired directly from the respective owners the adjoining 292 acres for $300,000.00 and an easement giving road ac-

cess thereto, and leased from Metts and his brother a small parcel of land on a highway interchange.

It is also undisputed that Mark Scoble, a real estate broker, became acquainted with Woodmancy about March 21, 1968. In their first conversation Woodmancy mentioned that the 1650 acre parcel was for sale and, at his invitation, Scoble inspected the property several days later. Scoble returned with a developer, Hewitt, and a friend, C. B. Wyvell, who was associated with Korzendorfer Realty.

Woodmancy and Metts testified that they priced the 1650 acres at $600.00 an acre to Scoble, Hewitt and Wyvell as principals interested in buying and not as agents. Scoble admitted that he might have expressed a desire to participate in the development of the property but insisted that he did not make any such statement "realistically".

Subsequently, Wyvell returned with Albert Perry, a Vice President of Korzendorfer Realty, to discuss the property with Metts. Wyvell and Perry testified that the selling price of $600.00 an acre and real estate commissions of ten per cent were then agreed upon, Wyvell's testimony being that commissions were mentioned by Perry along with other selling costs and that Metts nodded his head in agreement to everything that was said. Metts denied that any commissions were agreed upon or even discussed at this meeting, in which, according to Metts, Perry's main concern was the availability of the 1650 acres.

On April 1, 1968, when Perry brought Herbert A. Korzendorfer, President of Korzendorfer Realty, and Ralph Gibson, a representative of American Realty Service Corporation, to meet Metts, Gibson announced at the outset that American Realty would not pay a real estate commission if it purchased the land. Metts then made a "map presentation" of the property to Gibson, outlining from aerial photographs and maps the boundaries of the tract and its location with reference to highways and interchanges.

A day or so later Walter Utley, President of American Realty, met with Metts, Perry and Korzendorfer. Metts made his "map presentation" of the property to Utley. Metts testified that the night after this meeting Korzendorfer telephoned to say that he expected to get a ten per cent commission on the sale of the property. According to Metts this was his first information from Korzendorfer Realty about commissions and he angrily rejected the demand.

Wyvell testified that Metts complained to him by telephone about Korzendorfer's claim to a ten per cent real estate commission ($129,-000.00) because it included a commission on the 292 acre tract that

Metts was selling for the same price ($300,000.00) that he was paying for it. Wyvell said that during their conversation the commission was reduced to $100,000.00 which Metts agreed to pay. Metts denied that he ever agreed to pay any commission.

Scoble, who had a ten per cent interest in the commission, testified that Woodmancy complained to him about Korzendorfer's claim, denied that any commission was payable but stated that they intended to pay Scoble a finder's fee.

Korzendorfer submitted to Metts a written agreement dated April 4, 1968, providing that a commission of $100,000.00 would be payable on the sale of the 1650 acres and that no commission would be payable on the sale of the "300 acre parcel" at the same time to the same purchaser. Metts never signed this agreement.

On April 12, 1968, Metts, Korzendorfer, Perry, Gibson, and an attorney for American Realty met. On this date Metts signed an option agreement giving American Realty the right to purchase the 1650 acres and the adjoining 292 acres for $1,290,000.00. The agreement, also signed by Utley as President of American Realty, included a disclaimer by American Realty of any responsibility for real estate commissions.

As evidence of an express oral contract Korzendorfer Realty relies heavily upon this excerpt from Metts' testimony about Korzendorfer's demands:

"*He or his firm agreed to sell this property for $600 an acre,* but there was never any understanding that we would pay a ten per cent commission . . . ." (emphasis added).

We do not attach the significance to this statement which petitioner urges. The court could have inferred from it that Korzendorfer Realty agreed to sell the property for $600.00 an acre net to the owners. Therefore, the court could find, as it did, from the testimony of Metts and Woodmancy that there was no express contract for a commission.

The question of implied contract is more difficult for Korzendorfer Realty introduced the ultimate purchaser to Metts. But this alone is insufficient to impose liability for commissions upon the owner in the absence of an express or implied agreement. *Leicht-Benson Realty and Construction Corp.* v. *J. D. Stone & Co., Inc.* 138 Va. 511, 121 S. E. 883 (1924).

To recover under an implied contract the real estate broker must establish that he performed services which were the procuring cause

of the sale and under such circumstances as to give the owner reason to believe they were performed with the expectation of compensation. *Ford* v. *Gibson,* 191 Va. 96, 59 S. E. 2d 867 (1950). These are questions of fact. *Wilson* v. *Schmidt & Wilson, Inc.,* 184 Va. 642, 35 S. E. 2d 737 (1945).

Gibson and Metts testified that all the work of presenting the property to American Realty was done by Metts and that except for introducing Gibson to Metts, Korzendorfer Realty did nothing to promote the sale.

The court may have given unusual weight to the testimony of Gibson. No longer employed by American Realty at the time of trial and called as a witness for Korzendorfer Realty he nevertheless supported the position of the principal defendants.

Gibson pointed out that American Realty was interested in purchasing the 1650 acre tract only if other requirements were met. Accordingly, Metts "put the package together" by arranging for American Realty to purchase the 1650 acres, the adjoining 292 acres, and the easement to facilitate access thereto, and to lease the small parcel at the highway interchange. Gibson worked with Metts "on a very tight time schedule to get the engineering approved, to get the zoning approved, to get the highway department approval, to get the health department approval . . . " before American Realty could decide to buy.

Until the disclaimer was made by Gibson at the April first meeting Metts could have assumed that Korzendorfer Realty was acting as agent for American Realty and expected either to receive compensation from it or to participate in the development of the property. After the American Realty position was established the testimony of Metts and Gibson is that the sale was procured entirely through the efforts of Metts without any assistance from Korzendorfer Realty.

The evidence adduced by Korzendorfer Realty to carry its burden of proving an implied contract is at best vague and imprecise. Indeed, the court, in determining the credibility of witnesses, may have found it inconceivable that experienced real estate brokers could have expected to receive a commission of $100,000.00 based entirely on casual conversations which were subject not only to dispute but to varying interpretations.

The court's holding, based upon findings of fact supported by credible evidence, will be affirmed.

*Affirmed.*