COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Alston and Decker
Argued at Richmond, Virginia

ASSOCIATED ALUMINUM PRODUCTS AND
 BUILDERS MUTUAL INSURANCE COMPANY

                                                    MEMORANDUM OPINION[*] BY
v.      Record No. 2301-13-2                        JUDGE ROSSIE D. ALSTON, JR.
                                                    SEPTEMBER 16, 2014
SILVESTRE ELVIRA-MENEZ,
 RONNIE JENKINS, VIRGINIA FARM BUREAU,
 RODNEY BLAIR AND UNINSURED EMPLOYER'S FUND

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        S. Vernon Priddy, III (Michael L. Goff, Jr.; Two Rivers Law
        Group, P.C., on briefs), for appellants.

        E. Wayne Powell (Christian A. Parrish; The Parrish Law Group,
        P.C., on brief), for appellee Silvestre Elvira-Menez.

        Michael P. Del Bueno (Amber L. Ford; Whitt & Del Bueno, P.C.,
        on brief), for appellees Ronnie Jenkins and Virginia Farm Bureau.

        No brief or argument for appellees Rodney Blair and Uninsured
        Employer's Fund.


        Associated Aluminum Products ("AAPCO") challenges the commission's award of

temporary total disability benefits to Silvestre Elvira-Menez (claimant). AAPCO contends that

the commission erred in holding that claimant suffered a compensable injury that arose out of

and in the course of his employment. AAPCO also alleges that the commission erred in finding

AAPCO was claimant's statutory employer and, thus, liable for claimant's work-related injury.

Finding no error in the commission's award, we affirm.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

On appeal from the commission, "we view the evidence in the light most favorable to the party prevailing below." Tomes v. James City Fire, 39 Va. App. 424, 429-30, 573 S.E.2d 312, 315 (2002) (citing R.G. Moore Bldg. Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788 (1990)).

So viewed, the evidence indicated that Rodney Blair worked for a time as a subcontractor for AAPCO, performing roofing work on home remodeling projects. However, when Blair's insurance lapsed in September 2010, his direct relationship with AAPCO ceased. As a matter of company policy, AAPCO only subcontracted work to contractors carrying liability and workers' compensation insurance. Blair, however, was permitted to continue working on AAPCO projects so long as he "work[ed] with someone else" who was properly insured.

Blair subsequently pursued that option. At first, Blair worked for his stepson, who "had all the licenses and insurances to work for [AAPCO]." Under his stepson's company's name, Blair resumed subcontracting with AAPCO. Just as before, AAPCO contacted Blair directly with available roofing projects; but, when those projects were completed, AAPCO issued a check for the completed work to Blair's stepson, who then paid Blair.

Blair later entered into a similar arrangement with Ronnie Jenkins. Jenkins testified that he made the arrangement with Blair at AAPCO's request. As Jenkins understood the situation, "[Blair] had some issues with paperwork" and AAPCO needed Blair "to do a couple jobs in [Jenkins'] name until [Blair and AAPCO] got [the issue] straight in [AAPCO's] system."

---

[1] As the parties are fully conversant with the record in this case and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

Jenkins testified that he never directed Blair's work, visited Blair's jobsites, inspected Blair's work, or agreed to provide workers' compensation insurance for Blair.

As was the case when Blair worked under his stepson, AAPCO contacted Blair directly about available roofing projects. Blair explained that Jenkins did not "know that a job was started or finished until he [received] a check" from AAPCO. Under their arrangement, Jenkins retained ten percent of every check AAPCO paid for work Blair performed. Jenkins testified that he was taxed "for every dollar that . . . [was] in [his] name," including Blair's work, and that he retained ten percent of Blair's pay to cover such taxes. Jenkins testified that he "didn't profit from" the ten percent he retained from each of Blair's checks. Jenkins delivered the remaining cash value of every check to Blair.

AAPCO characterizes Jenkins' arrangement with Blair in a different light. Marvin Cravin, AAPCO's production manager at the time Blair began working under Jenkins' name, testified that Jenkins agreed to provide the insurance Blair needed to continue his construction work with AAPCO. Indeed, Cravin testified that before AAPCO permitted Blair to work under Jenkins' name, AAPCO required Jenkins to submit a certificate of insurance. Cravin described the certificate as permitting "[Blair] to do jobs" and for "[Jenkins] to have as many crews as he wanted, under his insurance, under his name, that could work on [AAPCO] jobs." Cravin added that, while he did not "know what the figures were," Jenkins kept "a percentage of [each check]" to cover the costs of insuring Blair. Accordingly, Cravin testified that AAPCO considered Blair an employee of Jenkins, and not an AAPCO subcontractor.

Blair similarly described his arrangement with Jenkins. Blair testified that "[Jenkins] was going to supply the . . . insurance and [Blair] would do the work." Blair further testified that he "maybe" considered himself Jenkins' employee, but added that Jenkins did not pay him benefits, place him on the company payroll, or supervise him in any way. Blair also reaffirmed that

AAPCO contacted him directly about potential roofing jobs, noting that Jenkins first learned of completed projects upon receipt of a check from AAPCO.

For the job at issue in this case (herein referred to as the "Lane Project"), AAPCO contacted Blair directly because the project was "primarily a roofing job." AAPCO's "crew sheet" for the Lane Project, which identified the crews assigned to the project, listed both Blair and Jenkins. But Bill Bartone, an AAPCO production manager, testified that he knew that Blair would perform the work because Jenkins did not perform roofing work "at that point." Indeed, Bartone testified that it was a "fair assumption" that he included Blair's name on the crew sheet to distinguish it from work performed by Jenkins. Moreover, in a separate AAPCO form, Bartone identified the crew on the Lane Project as Blair's.

Claimant began working for Blair approximately six months before suffering his work-related injuries. His job duties at that time included roofing and carpentry work. On the day of his injury, claimant rode to the jobsite with Blair, used tools Blair provided, and received instruction from Blair regarding what tasks to complete. Specifically, Blair instructed claimant to "remove the old roof" and then "put the new one on."

Claimant testified that he was placing new shingles on the roof when the accident occurred. He does not recall what caused him to fall from the roof. Claimant only recalls "react[ing]" after "[he] was already at the hospital." Claimant did testify, however, that there was nothing unique about the roof compared to those on which he normally worked.

Wilson Pacheco worked with claimant on the Lane Project, helping to remove "the [old] shingles" and preparing to re-shingle the roof. Pacheco was standing approximately eight feet from claimant when claimant fell from the roof. Through his interpreter, Pacheco testified about claimant's accident. At times in his testimony, Pacheco seemed to suggest that he observed claimant fall from the roof, but that he did not observe what caused claimant to fall.

- 4 -

> Q. [A]nd did you see [claimant] fall?
>
> A. I didn't see him when he fell but I heard when he slipped and fell.
>
> Q. [S]o you heard a slide?
>
> A. Yes.
>
> Q. What, what did you, could you describe what you heard?
>
> A. I didn't, his, I heard how he screamed when he falled [sic].

However, at other times during his testimony, Pacheco stated unequivocally that he observed claimant slip while working on the roof.

> Q. [W]ere you facing him?
>
> A. Yes I was, on one side where he was, on one side of the place where he was working.
>
> Q. [B]ut you could see the accident happen?
>
> A. Yes, he only just slid down and fall [sic].
>
> Q. Okay. So you saw him, you saw him fall?
>
> A. Yes.
>
>        \*     \*     \*     \*     \*     \*     \*
>
> Q. But you heard him scream?
>
> A. When he falled [sic], yes.
>
> Q. Is that what caused you to turn around?
>
> A. No I saw him, I saw him (unintelligible). I saw him when he slipped . . . .

Pacheco also testified in greater detail about what caused claimant to fall. Pacheco described how claimant slipped and "lost his balance" while trying to "put the shingles [down]." Pacheco testified that he "was sure [claimant] slipped" because "[Pacheco] could see in the

- 5 -

shingle where [claimant] slipped," i.e., Pacheco "could see" where claimant's shoe "rubbed off" or scuffed the shingle. Pacheco added that claimant "wanted to hang on," but claimant did not have anything to hang onto because the men were not given a harness.

As a result of his fall, claimant suffered a concussion and lacerations to his head and right arm. Shortly thereafter, claimant filed a claim for benefits naming AAPCO as his employer.

The deputy commissioner held a hearing on claimant's claim for benefits on November 2, 2012. AAPCO, Jenkins, and Blair were joined as defendants in that case. Because Blair did not have workers' compensation insurance, the Uninsured Employer's Fund was also made a party to the action. AAPCO and Jenkins both raised as a defense against the claim that claimant's injury did not arise out of or in the course of his employment. AAPCO also raised as a defense that Jenkins was claimant's "initial statutory employer" and thus liable for any compensable injury suffered by claimant. Jenkins denied AAPCO's contention.

On March 4, 2012, the deputy commissioner entered an award of temporary total disability benefits for claimant. The deputy commissioner reasoned that, although claimant could not recall what caused him to fall, Pacheco's testimony – that claimant slipped on a shingle while in the process of re-shingling a roof – "provided the evidence necessary to prove that . . . claimant's accident arose out of his employment" with Blair.

The deputy commissioner also concluded that Blair was "effectively a subcontractor of AAPCO." In reaching that finding, the deputy commissioner concluded that all of the parties – Blair, Jenkins, and AAPCO – understood that Blair would perform contracts directly for AAPCO and Jenkins would merely provide the necessary license and insurance. The deputy commissioner noted further that the evidence did not support an employee-employer relationship between Blair and Jenkins, as AAPCO contacted Blair directly with available projects, and Blair completed the projects without any involvement from Jenkins. In essence, the agreement

between Blair and Jenkins was merely a "ruse" to permit Blair to continue working for AAPCO without the appropriate license and insurance. This practice included the Lane Project. Thus, the deputy commissioner concluded that "AAPCO contracted with Blair" to perform the roofing project during which claimant was injured. Because Blair was uninsured at that time, the deputy commissioner concluded that AAPCO, as the general contractor, was liable under the Act as claimant's statutory employer.

On review, the full commission summarily adopted the deputy commissioner's findings of fact and conclusions of law, and entered an order affirming claimant's award of benefits.

This appeal followed.

ANALYSIS

I. Injury "arising out of" Claimant's Employment

AAPCO asserts that the commission erred in finding that claimant's injury arose out of his employment because the cause of claimant's injury was unexplained.

While the commission's determination that an accident arises out of a claimant's employment presents a mixed question of law and fact, Liberty Mutual Ins. Co. v. Herndon, 59 Va. App. 544, 555, 721 S.E.2d 32, 37 (2012), the commission's determination of causation is a question of fact, Ingersoll-Rand Co. v. Musick, 7 Va. App. 684, 688, 376 S.E.2d 814, 817 (1989).

To prevail under the Act, an employee must prove by a preponderance of the evidence that his injury arose out of and in the course of his employment. K & G Abatement Co. v. Keil, 38 Va. App. 744, 755, 568 S.E.2d 416, 421-22 (2002). "'The concepts "arising out of" and "in the course of" employment are not synonymous and both conditions must be proved before compensation will be awarded.'" Liberty Mutual Ins., 59 Va. App. at 556, 721 S.E.2d at 38 (quoting PYA/Monarch & Reliance Ins. Co. v. Harris, 22 Va. App. 215, 221, 468 S.E.2d 688,

691 (1996)).  "An accident occurs during the course of the employment if it takes place within the period of employment, at a place where the employee may reasonably be expected to be, and while the employee is reasonably fulfilling the duties of the employment or is doing something reasonably incidental to it."[2]  Briley v. Farm Fresh, Inc., 240 Va. 194, 197, 396 S.E.2d 835, 837 (1990).  "'[A]n accident arises out of the employment when there is a causal connection between the claimant's injury and the conditions under which the employer requires the work to be performed.'"  Liberty Mutual Ins., 59 Va. App. at 556, 721 S.E.2d at 38 (quoting United Parcel Servs. v. Fetterman, 230 Va. 257, 258, 336 S.E.2d 892, 893 (1985)).

In considering the "arising out of" prong, we apply the "actual risk test, which requires only that the employment expose the workman to a particular danger from which he was injured, notwithstanding the exposure of the public generally to like risks."  Green Hand Nursery, Inc. v. Loveless, 55 Va. App. 134, 144, 684 S.E.2d 818, 823 (2009).  Thus, "'if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises out of the employment.'"  Liberty Mutual Ins., 59 Va. App. at 556-57, 721 S.E.2d at 38 (quoting Simms v. Ruby Tuesday, Inc., 281 Va. 114, 122, 704 S.E.2d 359, 363 (2011)).

AAPCO contends that the commission erroneously applied a presumption that claimant's fall arose out of his employment, as claimant's injury was otherwise unexplained by the evidence before the commission.  We disagree.

---

[2] Although included in AAPCO's assignment of error, AAPCO did not address the "in the course of employment" prong on brief or during oral argument.  In any event, we find the evidence on this point conclusive.  Both Pacheco and claimant testified that they were instructed to re-shingle the roof of the home, and Pacheco also testified that claimant slipped while attempting to re-shingle the roof.  We therefore conclude that claimant's injuries occurred in the course of claimant's employment.

Claimant's accident was not unexplained. Pinkerton's, Inc. v. Helmes, 242 Va. 378, 381, 410 S.E.2d 646, 648 (1991) ("An unexplained accident, by definition, means that no one can relate how the accident happened."). Although claimant was unable to recall the cause of his accident, Pacheco testified that he observed claimant slip while re-shingling the roof during the Lane Project. Pacheco added that he knew claimant slipped because he observed a mark made by claimant's shoe on one of the shingles. Pacheco also testified that after claimant slipped, he had nothing to grab onto to stop his slide off of the roof because he was not provided a harness. The commission credited this testimony.

AAPCO casts the commission's finding as "an inferential leap," relying on portions of Pacheco's testimony that AAPCO reads to suggest that Pacheco did not observe claimant's slip. But Pacheco emphatically testified at the hearing that he "saw [claimant] when he slipped." The commission inferred only (and reasonably so, given Pacheco's testimony) "that a work-related risk caused [claimant] to fall and sustain injury." See Basement Waterproofing & Drainage v. Beland, 43 Va. App. 352, 358, 597 S.E.2d 286, 289 (2004) ("'It must . . . be remembered that the [c]ommission is empowered to draw reasonable inferences from proper testimony introduced.'" (quoting American Furniture Co. v. Graves, 141 Va. 1, 9, 126 S.E. 213, 215 (1925))). Indeed, the evidence clearly showed that it was the nature of claimant's employment that placed him on the roof. Claimant was instructed to re-shingle the roof, which he was doing just before he fell. Moreover, claimant was not provided a harness to prevent him from falling from the roof in the event he slipped or lost his balance. While claimant did not recall what caused him to fall, he sufficiently described his actions before the fall. Pacheco added to that testimony and provided the evidence necessary to establish the "critical link" between claimant's employment and his injury. Claimant slipped on a shingle while in the process of re-shingling the roof, and because

- 9 -

he was not provided a harness, claimant had nothing to grab onto to stop him from falling off of the roof, which was the cause of his injuries.

Upon consideration of these circumstances, a reasonable mind could conclude that there was a causal connection between claimant's work conditions and his resulting injury. Accordingly, we conclude that the commission did not err in finding that claimant's injury arose out of his employment.

## II.  Code § 65.2-302(A) Statutory Employer

AAPCO next alleges that the commission erred in holding that AAPCO was claimant's statutory employer under Code § 65.2-302(A).

> Code § 65.2-302(A) provides that when any owner contracts with another to perform any work within the owner's trade, business or occupation, the owner shall be liable to pay to any worker on the job "any compensation under this title which he would have been liable to pay if the worker had been immediately employed by him."

Gibbs v. Newport News Shipbuilding & Drydock Co., 284 Va. 677, 681, 733 S.E.2d 648, 651 (2012) (quoting Code § 65.2-302(A)).  "'[W]hether a particular person or entity is the statutory employer of an injured employee is a jurisdictional matter presenting a mixed question of law and fact that . . . [we] determine[] under the facts of each case.'"  Moore v. Virginia International Terminals, Inc., 283 Va. 232, 235, 720 S.E.2d 117, 118 (2012) (quoting Bosley v. Shepherd, 262 Va. 641, 648, 554 S.E.2d 77, 81 (2001)).  While we review the commission's ultimate legal conclusions *de novo*, the commission's findings of fact are conclusive and binding if supported by credible evidence in the record.

AAPCO asserts that the commission erred by finding Blair "a subcontractor of AAPCO" and holding that AAPCO, as the general contractor, was liable for claimant's work accident as his statutory employer.  AAPCO contends that it subcontracted the Lane Project to Jenkins, who

sub-subcontracted the roofing assignment to Blair, who in turn employed claimant. AAPCO therefore contends that Jenkins is claimant's *initial* statutory employer, and, in view of the commission's "policy of entering an award against only the first statutory employer in the ascending scale with adequate coverage," see Sites Constr. Co. v. Harbeson, 16 Va. App. 835, 839, 434 S.E.2d 1, 3 (1993), AAPCO contends that Jenkins "is responsible for payment of [claimant's] workers' compensation benefits."

As the deputy commissioner noted below, we think the central issue in this case is identifying the party AAPCO contracted with to perform the Lane Project. If AAPCO contracted with Jenkins to perform the Lane Project, and Jenkins subcontracted to Blair such work (assuming the work was within Jenkins' trade, business, or occupation), then Jenkins was claimant's initial statutory employer under Code § 65.2-302, as AAPCO contends. But if AAPCO contracted with Blair to perform the Lane Project, as the commission concluded, then AAPCO remains liable for the injuries sustained by claimant.

As there was no express contract among the parties, the commission considered the parties' conduct and dealings with one another to determine "who . . . AAPCO really contract[ed] with to perform the [Lane Project]." See Virginia Iron, Coal & Coke, 128 Va. 280, 289, 105 S.E. 107, 109 (1920) ("As there was no express contract, oral or written, we are compelled to ascertain the terms of the contract as best we may from the conduct and dealings of the parties with each other."). The commission concluded that AAPCO contracted Blair to perform that work. See Korzendorfer Realty, Inc. v. Hawkes, 211 Va. 534, 538, 178 S.E.2d 524, 527 (1971) (stating that whether an implied contract exists is a question of fact (citing Wilson v. Schmidt & Wilson, Inc., 184 Va. 642, 35 S.E.2d 737 (1945))).

The commission noted that AAPCO contacted Blair directly about working the Lane Project. AAPCO did not apprise Jenkins of the Lane Project, and Jenkins testified that he first

learned of the work after it was completed. Moreover, Bartone testified that AAPCO took internal measures to differentiate projects nominally assigned to Jenkins but completed by Blair (like the Lane Project) from those that were subcontracted to Jenkins. Specifically, Bartone testified that he listed "Blair/Jenkins" on the Lane Project crew sheet to distinguish it from work performed by Jenkins because he knew Blair would perform the work. On a separate form related to the Lane Project, Bartone listed the assigned crew as Blair's.

The commission found that Jenkins was not involved in the Lane Project beyond facilitating payment from AAPCO to Blair. Indeed, the commission determined that the parties' arrangement, permitting Blair to work AAPCO jobs under Jenkins' company name, was merely "a ruse to allow Blair to continue to get work from AAPCO despite not having the license and workers' compensation insurance required by AAPCO for its subcontractors."[3] Accordingly, the commission concluded that Blair was a subcontractor of AAPCO on the Lane Project.

Upon our review of the record, we find that the commission's factual conclusions and necessary inferences are not without support in the record. Accordingly, those findings are binding and conclusive upon us. We therefore conclude that AAPCO contracted with Blair, not Jenkins, to perform the Lane Project.

---

[3] AAPCO contends that, at minimum, the arrangement between Jenkins and Blair created an enforceable contract. AAPCO contends that Jenkins agreed to provide insurance for Blair in exchange for "taking ten percent [of any] amount paid by AAPCO," and argues that this Court "should hold claimant to said contract." While we recognize that third parties may bring suit to enforce a contract when certain conditions are met, see Levine v. Selective Ins. Co. of Am., 250 Va. 282, 285, 462 S.E.2d 81, 82 (1995) ("It is well established in this Commonwealth that under certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract."), AAPCO has cited neither case law nor evidence in the record to support its view that either it or claimant may seek to enforce the agreement between Jenkins and Blair. See Rule 5A:20(e) (requiring that appellant include in the opening brief the "principles of law and authorities" relating to each assignment of error). Accordingly, we consider this argument waived.

AAPCO argues that the evidence does not support the commission's finding that Blair was a subcontractor of AAPCO. While acknowledging its direct interactions with Blair, AAPCO contends that it subcontracted to Jenkins and "dealt directly with Rodney Blair" merely "[a]s a matter of convenience and agreed upon practice." AAPCO compares this factual arrangement to Uninsured Employer's Fund v. Clarke, 26 Va. App. 277, 494 S.E.2d 474 (1998), which AAPCO argues is controlling.

The facts of Clarke bear a resemblance to, but do not control the disposition of, this case. In Clarke, the claimant sustained injuries while roofing an addition to a house. Id. at 280, 494 S.E.2d at 475. At the time of his injuries, the claimant was employed by T.L.C. Repairs and Replacement (TLC), a company which worked exclusively as a sub-subcontractor for Independent Replacement Services (IRS). Id. at 280-81, 494 S.E.2d at 475-76. Ordinarily, IRS assigned work orders to its sub-subcontractors and "pa[id] its sub-subcontractors each [week] for work completed." Id. at 281, 494 S.E.2d at 476. However, on some occasions a general contractor would request that a sub-subcontractor (like TLC) complete additional work. Id. at 281-82, 494 S.E.2d at 476. When asked to complete such projects, "[TLC] would perform the work without a job order from IRS, but would send the paper work to IRS, which would bill the general contractor and pay TLC." Id. at 281, 494 S.E.2d at 476. The claimant sustained his injuries during such a project. Id. "[A] general contractor asked [TLC] to roof an addition to a house on which TLC had worked previously through IRS." Id. TLC did not receive a job order from IRS to complete that job. Id. at 282, 494 S.E.2d at 476. "However, TLC followed usual procedure and performed the work without a work order," and upon completion of the work "followed usual billing procedure and was paid by IRS." Id.

On appeal, this Court considered whether the commission erred in holding IRS liable for the claimant's injuries as the claimant's statutory employer. Affirming the commission and its

critical finding of fact, this Court concluded that "TLC was performing work for IRS" at the time the claimant was injured. Id. at 284, 494 S.E.2d at 478. In reaching that conclusion, this Court noted that "TLC worked exclusively for IRS and routinely completed jobs for general contractors without a work order from IRS." Id. Consistent with the findings of the commission, this Court determined that "IRS adopted this practice both by paying TLC and by billing the general contractors." Id. at 285, 494 S.E.2d at 478. Thus, the general contractors' dealings with TLC were "not contractual negotiations" but merely a form of "effective and efficient communication." Id. at 284, 494 S.E.2d at 478.

Despite superficial similarities, we find this case differs significantly from Clarke. Unlike in Clarke, Jenkins' involvement with Blair and AAPCO was entirely passive and disinterested. While in Clarke, IRS actively interceded between TLC and the general contractor – accepting TLC's work as work performed for IRS (paying TLC for work completed at a general contractor's request) and advancing its own claims against the general contractor (billing the general contractor for work TLC completed) – here Jenkins served only as a pass-through or conduit for payment from AAPCO to Blair. Jenkins did not advance his own funds to Blair for work completed at AAPCO's request. Jenkins did not bill AAPCO for work completed by Blair. As Blair testified before the deputy commissioner, Jenkins was not aware that a project was started or completed until he received a check from AAPCO. Even then Jenkins' actions upon receipt of each check from AAPCO fall well short of the conduct so crucial in Clarke. As Jenkins explained, he retained only ten percent of each check, which he used to offset costs he incurred by virtue of his arrangement with Blair.[4] The commission found Jenkins' testimony

---

[4] AAPCO challenges this testimony as "inherently incredible," but has not provided citation to legal authority or the record in support of its argument. See Rule 5A:20(e) (requiring that appellant include in the opening brief the "principles of law and authorities" relating to each assignment of error). Accordingly, we consider this argument waived.

- 14 -

credible on this point and noted that he did not profit from the arrangement. More so than any other, this last point explains why Jenkins lacked the personal interest that characterized IRS's engagement with TLC and the general contractor. AAPCO's and Blair's work dealings had no influence on Jenkins. If, for example, AAPCO had ceased paying for work completed by Blair, Jenkins would have had no reason to personally pursue the issue because he would not have been affected, which could not be said of IRS.

Because we find that AAPCO contracted with Blair to perform work within AAPCO's "trade, business or occupation," and claimant was injured during that work, we affirm the commission's award entered in favor of claimant against AAPCO. See Jones v. Commonwealth, 267 Va. 218, 221, 591 S.E.2d 72, 74 (2004) ("[The] 'statutory employer' provision is designed to ensure that owners do not escape liability for workers' compensation benefits by having their work performed by others." (citing Henderson v. Central Tel. Co., 233 Va. 377, 381, 355 S.E.2d 596, 598-99 (1987))).

## CONCLUSION

For the foregoing reasons, we affirm the award entered by the commission.

Affirmed.